UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

UNITED STATES OF AMERICA,

26 CR 99 MJD/DTS

**INDICTMENT**

v.

18 U.S.C. § 2
18 U.S.C. § 982(a)(7)
18 U.S.C. § 1347

1. SHAMSO AHMED HASSAN, and
2. HANAAN MURSAL YUSUF,

18 U.S.C. § 1349
18 U.S.C. § 1957
21 U.S.C. § 853(p)

Defendants.

28 U.S.C. § 2461(c)

**THE UNITED STATES GRAND JURY CHARGES THAT:**

At times relevant to this Indictment:

1.      Medicaid was a health and long-term care coverage program jointly financed by states and the federal government pursuant to the Social Security Act of 1965 that provided benefits to individuals and families who met specified financial and other eligibility requirements, and certain other individuals who lacked adequate resources to pay for medical care. The Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services ("HHS"), was responsible for overseeing Medicaid in participating states, including Minnesota.

2.      Individuals who received benefits under Medicaid were referred to as "recipients."

3.      Medicaid was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b), and a "Federal health care program," as defined by Title 42, United States Code, Section 1320a-7b(f).

SCANNED

MAY 2 0 2026

U.S. DISTRICT COURT MPLS

*United States v. Hassan, et al.*

4.      Each state, including Minnesota, established and administered its own Medicaid program and determined the type, amount, duration, and scope of services covered within broad federal guidelines.

5.      Medicaid covered the costs of medical services and products ranging from routine preventative medical care for children to institutional care for the elderly and disabled. Service providers were authorized to submit claims to Medicaid only for services they actually rendered and were required to maintain patient records verifying the provision of services. By submitting a claim, the provider certified, among other things, that the services were medically necessary, rendered to the patient as represented, and not rendered as a result of kickbacks or bribes.

6.      In Minnesota, Medicaid was administered by the Minnesota Department of Human Services ("DHS").

7.      Medicaid managed care provided for the delivery of Medicaid health benefits and additional services through contracted arrangements between state Medicaid agencies and managed care organizations ("MCOs"), such as PrimeWest Health, that accepted a per recipient per month capitation payment for these services.

8.      The MCOs were each a "health care benefit program," as defined by Title 18, United States Code, Section 24(b).

9.      Medicaid providers were required to meet certain requirements in order to participate in the Medicaid program, including billing and recordkeeping requirements. In Minnesota, these requirements were set forth in the Minnesota Health Care Programs ("MHCP") Provider Manual.

*United States v. Hassan, et al.*

**A.    The Minnesota Early Intensive Development and Behavioral Intervention ("EIDBI") Program**

10.    Autism spectrum disorder ("ASD" or "autism") was a neurological and developmental disorder that affected how people interact with others, communicate, learn, and behave.

11.    Applied Behavior Analysis, sometimes called "ABA therapy," was a type of one-on-one behavioral therapy designed to help children on the autism spectrum develop social and emotional skills. ABA therapy sought to improve social skills by rewarding and reinforcing positive behavior while discouraging negative behavior.

12.    The EIDBI program was a federally funded Minnesota health care program. According to the DHS website, the purpose of the EIDBI program was "to provide medically necessary, early and intensive intervention for people with ASD and related conditions."

13.    The EIDBI program covered various treatment options, including ABA therapy, for persons diagnosed with ASD and related conditions.

14.    In order to qualify for the EIDBI benefit, a person must have been less than 21 years old; have been diagnosed with ASD or a related condition; have had a comprehensive multi-disciplinary evaluation ("CMDE") that established his or her medical need for EIDBI services; and have been enrolled in a qualifying health care program, such as Medicaid.

15.    The CMDE was used to develop the person's individual treatment plan ("ITP"). An ITP was a personalized, written plan of care that outlined the goals for

*United States v. Hassan, et al.*

the person and set forth the specific interventions the person would receive based on his or her individually assessed needs.

16.    EIDBI provider agencies were legal entities or individuals approved by DHS and the State of Minnesota to provide EIDBI services.

17.    EIDBI treatment services were required to be delivered under the supervision of a Qualified Supervising Professional ("QSP") who was employed by the EIDBI provider. A QSP supervised and managed all aspects of EIDBI services, treatment, and documentation, including supervising the medical providers who provided services. The QSP assumed full professional responsibility for the services provided by each supervisee, including the supervisee's actions and decisions.

18.    Level I and Level II providers oversaw the implementation of ITPs and worked with EIDBI client-patients. Providers participated in monitoring progress, goals, objectives, and treatment outcomes. All providers were responsible for documenting all services provided in case notes. Level I and Level II providers were required to meet certain, defined qualifications, including education and experience qualifications. The qualifications for Level I providers were more stringent than the qualifications for Level II providers.

19.    The MHCP Provider Manual provided information specific to each category of enrolled provider, including EIDBI providers, who billed codes related to ABA therapy services for ASD.

20.    EIDBI professionals, like other providers of services to Medicaid recipients through MHCP, were required to observe rules designed to ensure quality

4

*United States v. Hassan, et al.*

of care, medical necessity, and the appropriate and accurate billing of services provided. Those requirements included the following:

    a.    <u>Health Service Records</u>. As a condition for payment, the provider was required to document each occurrence of a health service provided to a recipient. The health service was required to be documented in the recipient's health service record, and was required to include the following: the recipient's personal information and legal representative; the date on which the entry was made; the date or dates on which the health service was provided; contact information for the QSP; information about other services the person or legal representative received; the start and stop times and/or length of time spent with the recipient if the amount paid for the service depends on time spent; the signature and title of the person from whom the recipient received the service; completed and current CDME; completed and current ITP; a plan for providing clinical supervision, observation, and direction to individual providers; and preferences of the parent(s) and/or caregiver(s) for EIDBI services, including their level of involvement.

    b.    <u>Retention of Claims Records and Other Documentation</u>. Providers were required to retain records, including all health service and financial records related to a health service for which payment under a program was received or billed, for at least five years after the initial date of billing. The retention requirement applied to a provider after withdrawal or termination from the program, and after a change of ownership.

*United States v. Hassan, et al.*

      c.      <u>Billing Procedures</u>. EIDBI providers were required to follow DHS billing rules designed to ensure the submission of accurate and honest reimbursement of claims for services actually provided. The requirements regarding claims submission to DHS were set forth in the MHCP Provider Manual and included the following:

      i.      <u>Billing for Services Actually Provided</u>. Providers who contracted with DHS agreed to bill for services actually provided. Providers submitted claims to DHS electronically and under a recipient's individual identifying number. The claims provided a procedure code, indicating the service, along with the provider's Unique Minnesota Provider Identifier and National Provider Identifier ("NPI") for direct payment to the provider. The claims also identified the medical professional who prescribed or ordered the service, as entered by the provider.

      ii.      <u>Billing Only After Services Have Been Provided</u>. Providers were required to submit claims to DHS only after covered services were rendered. Providers were not allowed to submit reimbursement claims for services purportedly to be provided at a future time.

21.      MHCP also required providers to disclose the identity of any person or business with an ownership and controlling interest in the provider business entity, as well as the identity of any board member, officer, business and finance controller (e.g., Chief Executive Officer ("CEO"), Chief Financial Officer ("CFO"), Chief

6

*United States v. Hassan, et al.*

Operating Officer ("COO"), and Chief Technology Officer ("CTO")), and managing employee, at the time of enrollment in the program and upon any change in ownership or controlling interest in the business.

22.     DHS defined an "owner" as any person or business that had a direct or indirect controlling interest of 5% or more in the business entity.

23.     DHS defined "managing employee" as a person other than the CEO, CFO, COO, or CTO, who exercised operational or managerial control over, or who directly or indirectly conducted or managed the day-to-day operations, such as a general manager, business manager, administrator, or director.

**B.     The Defendants, Related Individuals, and Related Entities**

24.     Defendant SHAMSO AHMED HASSAN was a resident of the State of Minnesota and a beneficial owner of Smart Therapy Center LLC ("Smart Therapy") and Star Autism Center LLC ("Star Autism"). On or about February 7, 2023, SHAMSO AHMED HASSAN enrolled with DHS as a Level II provider of EIDBI services on behalf of Smart Therapy.

25.     Defendant HANAAN MURSAL YUSUF was a resident of the State of Minnesota, an employee of Smart Therapy, and the lead biller for Smart Therapy responsible for submitting claims to Medicaid. On or about March 18, 2020, HANAAN MURSAL YUSUF enrolled with DHS as a Level II provider of EIDBI services on behalf of Smart Therapy. On or about January 1, 2024, HANAAN MURSAL YUSUF enrolled with DHS as a Level I provider of EIDBI services on behalf of Smart Therapy, permitting Smart Therapy to bill for her services at a higher rate.

7

*United States v. Hassan, et al.*

26.     Co-Conspirator #1 was a resident of the State of Minnesota and a beneficial owner of Smart Therapy.

27.     Co-Conspirator #2 was a resident of the State of Minnesota and a beneficial owner of Star Autism.

28.     Individual #1 was a resident of the State of Minnesota, SHAMSO AHMED HASSAN's husband, and a beneficial owner of Smart Therapy and Star Autism.

<u>Smart Therapy</u>

29.     On or about November 21, 2019, Co-Conspirator #1 formed Smart Therapy in the State of Minnesota. Co-Conspirator #1 enrolled Smart Therapy in the EIDBI program as a provider agency on or about December 10, 2019.

30.     On or about December 10, 2019, Co-Conspirator #1 submitted a Disclosure of Ownership and Control Interest of an Entity form to DHS on behalf of Smart Therapy that disclosed Co-Conspirator #1 as the 100% owner of Smart Therapy.

31.     Between November 2019 and March 2023, SHAMSO AHMED HASSAN held a 50% ownership interest in Smart Therapy, while Co-Conspirator #1 and Individual #1 each held 25% ownership interests.

32.     On or about March 2, 2023, SHAMSO AHMED HASSAN, Co-Conspirator #1, and Individual #1 signed and executed an Operating Agreement for Smart Therapy that modified the ownership percentages in the company. Thereafter, SHAMSO AHMED HASSAN and Co-Conspirator #1 each held a 35% ownership

8

*United States v. Hassan, et al.*

interest, Individual #1 held a 10% ownership interest, and two other individuals each held a 10% ownership interest.

33. SHAMSO AHMED HASSAN, HANAAN MURSAL YUSUF, Co-Conspirator #1, and others were involved in operation of Smart Therapy until it ceased providing EIDBI services in or around December 2024.

34. SHAMSO AHMED HASSAN received significant profit distributions from Smart Therapy.

35. HANAAN MURSAL YUSUF received significant profit distributions from Smart Therapy, despite not having a documented ownership interest in the company.

*Star Autism*

36. On or about August 24, 2020, Co-Conspirator #2 formed Star Autism in the State of Minnesota and enrolled Star Autism in the EIDBI program as a provider agency.

37. On or about August 24, 2020, Co-Conspirator #2 submitted a Disclosure of Ownership and Control Interest of an Entity form to DHS on behalf of Star Autism that disclosed Co-Conspirator #2 as the 100% owner of Star Autism.

38. On or about April 27, 2021, Co-Conspirator #2 assigned 60% of Co-Conspirator's financial interest in Star Autism to each of SHAMSO AHMED HASSAN (20%), Co-Conspirator #1 (20%), and Individual #1 (20%).

*United States v. Hassan, et al.*

39.    SHAMSO AHMED HASSAN, Co-Conspirator #1, and Co-Conspirator #2 were involved in the operation of Star Autism from in or around August 2020 through in or around December 2024, when it ceased providing EIDBI services.

40.    SHAMSO AHMED HASSAN received significant profit distributions from Star Autism.

41.    HANAAN MURSAL YUSUF received significant profit distributions from Star Autism, despite not having a documented ownership interest in the company or working for the company.

## COUNT 1
### (Conspiracy to Commit Health Care Fraud)

42.    Paragraphs 1 through 41 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

43.    Beginning in or around November 2019, and continuing through in or around December 2024, in the State and District of Minnesota and elsewhere, the defendants,

SHAMSO AHMED HASSAN and
HANAAN MURSAL YUSUF,

did knowingly and willfully combine, conspire, confederate, and agree with Co-Conspirator #1, Co-Conspirator #2, and others known and unknown, to violate Title 18, United States Code, Section 1347, that is, to knowingly and willfully execute a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, Medicaid, and to obtain, by means of materially false and fraudulent pretenses, representations, and

*United States v. Hassan, et al.*

promises, money and property owned by, and under the custody and control of, said health care benefit program, in connection with the delivery of and payment for health care benefits, items, and services.

## Purpose of the Conspiracy

44.    It was the purpose of the conspiracy for SHAMSO AHMED HASSAN, HANAAN MURSAL YUSUF, Co-Conspirator #1, Co-Conspirator #2, and others to unlawfully enrich themselves by: (a) submitting and causing the submission, on behalf of Smart Therapy and Star Autism, of false and fraudulent claims to Medicaid for EIDBI services that were not provided; (b) submitting and causing the submission, on behalf of Smart Therapy and Star Autism, of false and fraudulent representations, pretenses, and promises within certification and enrollment forms submitted to DHS, in order to become and remain enrolled as an MHCP provider in the EIDBI program; (c) paying illegal kickbacks and bribes to parents in exchange for enrollment of their Medicaid-eligible children to receive EIDBI services at Smart Therapy and Star Autism; (d) concealing the submission of false and fraudulent representations, pretenses, promises, and claims to DHS, and the receipt and transfer of proceeds from the fraud; and (e) diverting proceeds of the fraud for the personal use and benefit of SHAMSO AHMED HASSAN, HANAAN MURSAL YUSUF, and their co-conspirators, and to further the fraud.

11

*United States v. Hassan, et al.*

## Manner and Means of the Conspiracy

45.   The manner and means by which SHAMSO AHMED HASSAN, HANAAN MURSAL YUSUF, and their co-conspirators sought to accomplish the objects and purpose of the conspiracy included, among others, the following:

a.   SHAMSO AHMED HASSAN, HANAAN MURSAL YUSUF, and their co-conspirators knowingly and willfully submitted claims for Medicaid reimbursement to DHS for EIDBI services that were medically unnecessary and that were purportedly rendered to recipients who appeared to be diagnosed with autism regardless of medical necessity.

b.   SHAMSO AHMED HASSAN, HANAAN MURSAL YUSUF, and their co-conspirators knowingly and willfully submitted claims for Medicaid reimbursement to DHS for EIDBI services purportedly rendered by medical providers at Smart Therapy and Star Autism who, in fact, did not work at either business at the time the services were purportedly rendered. In some instances, these providers worked for Smart Therapy or Star Autism only for a short period of time, after which Smart Therapy and Star Autism continued to submit claims for Medicaid reimbursement to DHS for EIDBI services that the provider did not provide. In other instances, the purported providers only attended a single training at Smart Therapy or Star Autism and never became employed there. Yet the centers enrolled these individuals with DHS as providers and billed for EIDBI services that the individuals could not, and did not, provide, all without the individuals' knowledge.

12

*United States v. Hassan, et al.*

c.  SHAMSO AHMED HASSAN, HANAAN MURSAL YUSUF, and their co-conspirators knowingly and willfully submitted significantly inflated claims for Medicaid reimbursement to DHS for EIDBI family and caregiver training purportedly provided by Smart Therapy and Star Autism that rarely, if ever, was provided. For example, between April 2023 and October 2024, Smart Therapy submitted claims for reimbursement to DHS for over 3,000 hours of EIDBI family and caregiver training purportedly provided to a single Medicaid recipient's family. The recipient's family never received any training from Smart Therapy.

d.  SHAMSO AHMED HASSAN, HANAAN MURSAL YUSUF, and their co-conspirators falsely documented Co-Conspirator #1 and Co-Conspirator #2 as the sole owners of Smart Therapy and Star Autism, respectively, on the enrollment, certification, and disclosure forms submitted to DHS and MCOs to allow billing to Medicaid. In fact, SHAMSO AHMED HASSAN and Individual #1, along with their co-conspirators and others, maintained ownership and managing control over Smart Therapy and Star Autism. SHAMSO AHMED HASSAN, Individual #1, and others, caused these false representations to be made to conceal and disguise SHAMSO AHMED HASSAN and Individual #1's role in the scheme, and to further the fraudulent operation of Smart Therapy and Star Autism.

e.  SHAMSO AHMED HASSAN, HANAAN MURSAL YUSUF, and their co-conspirators paid illegal cash kickbacks of approximately $300 to

13

*United States v. Hassan, et al.*

$1,500 per month, per child, to parents in exchange for enrollment of their Medicaid-eligible children to receive EIDBI services at Smart Therapy or Star Autism. SHAMSO AHMED HASSAN, HANAAN MURSAL YUSUF, and their co-conspirators disguised the kickbacks by writing checks payable to family members and employees and directing them to cash the checks and give the cash to parents monthly, and by referring to the illegal kickback payments using the code word "computer."

f.       SHAMSO AHMED HASSAN had access to the bank accounts held in the name of Smart Therapy and Star Autism and wrote multiple, high-dollar checks payable to herself, HANAAN MURSAL YUSUF, her co-conspirators, employees of Smart Therapy and Star Autism, and her family members. In numerous instances, associates of SHAMSO AHMED HASSAN who received checks from Smart Therapy and Star Autism had no legitimate basis for receiving funds from the centers.

g.       From in or around May 2020 through in or around December 2024, SHAMSO AHMED HASSAN, HANAAN MURSAL YUSUF, their co-conspirators, and others submitted and caused the submission of false and fraudulent claims to Medicaid for EIDBI services that were medically unnecessary, not actually provided, not eligible for reimbursement, and procured through illegal kickbacks on behalf of Smart Therapy and Star Autism, in an approximate amount of $46.6 million, for which Smart Therapy and Star Autism were reimbursed approximately $21.1 million.

14

*United States v. Hassan, et al.*

h.     From in or around April 2023 through in or around October 2024, Smart Therapy submitted approximately $346,000 in claims for reimbursement to DHS for EIDBI services purportedly provided by SHAMSO AHMED HASSAN, for which it was reimbursed approximately $141,000.

i.     From in or around May 2022 through in or around November 2024, Smart Therapy submitted approximately $676,000 in claims for reimbursement to DHS for EIDBI services purportedly provided by HANAAN MURSAL YUSUF, for which it was reimbursed approximately $302,000.

j.     SHAMSO AHMED HASSAN, HANAAN MURSAL YUSUF, and others diverted hundreds of thousands of dollars of the fraud proceeds that Smart Therapy and Star Autism obtained from Minnesota Medicaid for their and their families' personal use and benefit, including through real property purchases and transferring funds overseas, including to Kenya.

All in violation of Title 18, United States Code, Section 1349.

### Counts 2–8
(Health Care Fraud)

46.     Paragraphs 1 through 41 of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

47.     Beginning in or around November 2019, and continuing through in or around December 2024, including on or about the dates enumerated below, in the State and District of Minnesota and elsewhere, the defendants,

SHAMSO AHMED HASSAN and
HANAAN MURSAL YUSUF,

15

*United States v. Hassan, et al.*

in connection with the delivery of, and payment for, health care benefits, items, and services, did knowingly and willfully execute, and attempt to execute, a scheme and artifice to defraud Medicaid, a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, any money and property owned by, and under the custody or control of, said health care benefit program, in connection with the delivery of, and payment for, health care benefits, items, and services, by submitting and causing the submission of false and fraudulent claims to Medicaid.

### Purpose of the Scheme and Artifice

48.     Paragraph 44 of this Indictment is re-alleged and incorporated by reference as though fully set forth herein as a description of the purpose of the scheme and artifice.

### The Scheme and Artifice

49.     Paragraph 45 of this Indictment is re-alleged and incorporated by reference as though fully set forth herein as a description of the scheme and artifice.

### Acts in Execution of the Scheme and Artifice

50.     On or about the dates specified below, in the District of Minnesota and elsewhere, as to the defendants set forth as to each count below, aided and abetted by, and aiding and abetting others known and unknown to the Grand Jury, the defendants did knowingly and willfully execute, and attempt to execute, a scheme and artifice to defraud a health care benefit program affecting commerce, that is,

16

*United States v. Hassan, et al.*

Medicaid, and to obtain by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, Medicaid, in connection with the delivery of, and payment for, health care benefits, items, and services, by causing the submission of the following false and fraudulent claims to Medicaid by Smart Therapy:

| Count | Defendant | Medicaid Recipient | Claim Date | Claim Number | Service Billed | Approx. Amount Billed to Medicaid |
|---|---|---|---|---|---|---|
| 2 | HANAAN MURSAL YUSUF | M.D. | 1/4/22 | 9213640040002760 | Individual Intervention Adaptive Behavior Treatment, 7 hours | $2,940 |
| 3 | HANAAN MURSAL YUSUF | H.D. | 2/1/22 | 5220260040007265 | Family or Caregiver Training, 4 hours | $560 |
| 4 | HANAAN MURSAL YUSUF | R.N. | 2/15/22 | 5220410040004146 | Individual Intervention, Adaptive Behavior Treatment, 4.5 hours | $630 |
| 5 | HANAAN MURSAL YUSUF | M.H. | 2/25/22 | 7220700040063448 | Family or Caregiver Training, 4 hours | $560 |
| 6 | HANAAN MURSAL YUSUF | R.N. | 3/1/22 | 5220550040011046 | Family or Caregiver Training, 3 hours | $420 |
| 7 | SHAMSO AHMED HASSAN | A.G. | 6/21/23 | 5231600040004767 | Family or Caregiver Training, 4 hours | $560 |

*United States v. Hassan, et al.*

| Count | Defendant | Medicaid Recipient | Claim Date | Claim Number | Service Billed | Approx. Amount Billed to Medicaid |
|---|---|---|---|---|---|---|
| 8 | SHAMSO AHMED HASSAN | B.G. | 3/12/24 | 4240580090920074 | Family or Caregiver Training, 4 hours | $560 |

All in violation of Title 18, United States Code, Sections 1347 and 2.

### COUNTS 9 and 10
### (Money Laundering)

51.     On or about the dates set forth as to each count below, in the District of Minnesota and elsewhere, as to the defendants set forth as to each count below, aided and abetted by, and aiding and abetting others known and unknown to the Grand Jury, the defendants did knowingly engage and attempt to engage in a monetary transaction affecting interstate and foreign commerce by, through, and to a financial institution, in criminally derived property of a value greater than $10,000, and such property having been derived from a specified unlawful activity, that is, health care fraud, in violation of Title 18, United States Code, Section 1347:

| Count | Defendant | Description | Date | Amount |
|---|---|---|---|---|
| 9 | HANAAN MURSAL YUSUF | Wire transfer from HANAAN MURSAL YUSUF's personal bank account (x0163) to Real Estate Company #1 | 9/30/21 | $30,000 |
| 10 | SHAMSO AHMED HASSAN | Check from SHAMSO AHMED HASSAN's personal bank account (x0532) to Money Transmitting Company #1 | 6/2/23 | $11,770 |

All in violation of Title 18, United States Code, Sections 1957(a) and 2.

18

*United States v. Hassan, et al.*

## FORFEITURE ALLEGATIONS

52.    The allegations contained in paragraphs 1 through 51 of this Indictment are incorporated by reference as if set forth fully herein for the purpose of alleging forfeiture against defendants SHAMSO AHMED HASSAN and HANAAN MURSAL YUSUF, pursuant to the provisions of Title 18, United States Code, Section 982.

53.    Pursuant to Title 18, United States Code, Section 982(a)(7), upon being convicted of the crimes charged in Counts 1 through 8 of this Indictment, the convicted defendant shall forfeit to the United States any property`, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense.

54.    Pursuant to Title 18, United States Code, Section 982(a)(1), upon being convicted of the crimes charged in Counts 9 and 10 of this Indictment, the convicted defendant shall forfeit to the United States any property, real or personal, involved in the commission of the offense, or any property traceable to such property.

55.    If any of the above-described forfeitable property is unavailable for forfeiture, the United States intends to seek the forfeiture of substitute property as provided for in Title 21, United States Code, Section 853(p) as incorporated by Title 18, United States Code, Section 982(b)(1).

### A TRUE BILL

_____          _____
UNITED STATES ATTORNEY                FOREPERSON